**UUNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

IN RE

DUANE L. BENTLEY                                                                            CASE NO. 18-20281

DEBTOR

**MEMORANDUM OPINION AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT REGARDING
DEBTOR'S MOTION FOR CONTEMPT AGAINST ONEMAIN**

A chapter 7 debtor who elected to surrender a vehicle contends that the lienholder must either repossess the vehicle or release its lien to avoid contempt. This is not the law. As explained below, a creditor that fails to do one or the other does not necessarily violate the discharge injunction.

This matter is before the Court to resolve Debtor's Motion for Contempt [ECF No. 16] against Creditor OneMain Financial Group, LLC, based on its purported violation of § 524(a)(2).[1] The Court granted Debtor's motion to apply Rule 7012 to this contested matter, and Creditor filed a Response. [ECF No. 25.] The parties then took discovery on Debtor's allegations concerning his interactions with Creditor, and both Debtor [ECF No. 75] and Creditor [ECF No. 78] moved for a summary judgment, arguing that the Motion for Contempt should be resolved in their favor. The parties fully briefed the summary judgment motions, the Court heard argument, and the motions are now ripe for a determination. Because the material facts are undisputed, the Court can resolve the cross-motions as a matter of law.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. References to the Federal Rules of Bankruptcy Procedure appear as "Rule __."

## JURISDICTION

This Court has jurisdiction over this contested matter. 28 U.S.C. § 1334(b). Venue is proper in this District. 28 U.S.C. §§ 1408, 1409. This is a core proceeding, and the Court is authorized to enter a final order adjudicating this matter. 28 U.S.C. § 157(b)(2)(A) and (O). The parties have consented to the Court's entry of final orders.

## BACKGROUND

The parties agree on the material facts. In June 2017, Debtor obtained a loan from Creditor and granted Creditor a lien on a 2001 Dodge Dakota (the "Vehicle"). Debtor filed a chapter 7 petition on March 5, 2018, and Creditor received notice of the bankruptcy filing. Debtor's Schedule D, filed with his petition, stated that Creditor had an $8,000 claim secured by the Vehicle, which Debtor valued at $150. Debtor also filed a statement of his intention to surrender the Vehicle to Creditor with his petition. Debtor did not reaffirm the debt to Creditor before entry of his discharge on June 11, 2018. Creditor's lien was not avoided or eliminated in the bankruptcy, and Creditor received notice of entry of the discharge. Debtor never paid the balance of Creditor's claim. Creditor never repossessed the Vehicle, which was stored on property owned by Debtor's ex-father-in-law, Paul Reis.

On June 29, 2018, Debtor called Creditor[2] and stated that he had received his discharge, wanted "to take the lien off the title of the vehicle that was in bankruptcy that you guys have the lien on," and advised that the Vehicle "is old. It's trash. It's totaled." [ECF No. 78-1 at 6.] Creditor's representative told Debtor: "once there's a discharge you are not responsible for the

---

[2] Transcribed versions of this call and other calls involving Debtor and Creditor are in the record. Debtor affirmed at his deposition that the call transcripts accurately reflected the conversations he and Mr. Reis had with Creditor. Mr. Reis agreed that the transcripts were accurate.

2

balance of the loan, but creditors are allowed to keep an interest in the lien on the vehicle and they'll ask for some kind of offer to be made for a lien release." [*Id*.] Creditor's representative then said that it sounded as though "this is just a salvage car. It's junk value probably," and told Debtor to have a local salvage yard call Creditor to provide a "scrap value offer maybe so much on the pound" at which point Creditor would "consider accepting that to release the lien. They will sell it for some minimal consideration and get the lien released." [*Id*. at 7.]

Several weeks later, on August 1, 2018, Mr. Reis and Debtor called Creditor. Near the start of the call, Creditor's representative advised Debtor: "If your personal liability to this debt has been discharged in bankruptcy, any payments you make on this account are voluntary[.] [A]lthough you may not be legally obligated to repay this debt, [a lien] on or against collateral securing the account may have survived the discharge[]. If such a lien exists, [Creditor] may enforce any applicable state release [*sic*] to recover such collateral." [ECF No. 78-1 at 11.] The representative, speaking with Mr. Reis (at Debtor's request and with his permission), advised that Creditor would not repossess the Vehicle because "[t]he value is too low," and then said:

> So the options that we can give now are working with a salvage yard, an individual or the customer himself. If it's a customer or a third party wanting to make an offer on it against the lien, then we would require a mechanic's estimate to come along with that offer. If it's a really low offer just to support the value that you're saying the vehicle is worth. If it's a junk vehicle and doesn't run and you're wanting to just scrap it, you can contact the local salvage yard to see if they are interested in working with us. You would explain to them that we are the lienholders and they would call and make an offer on the lien and then once that is approved by management and we could work with them to get payment and release that lien to the salvage yard.

[*Id*. at 12.] Mr. Reis responded that he would have the Vehicle towed to the highway or to one of Creditor's locations. Creditor's representative then stated that Debtor still owned the Vehicle, that Creditor only had a lien on it, and that Debtor would be charged any fees associated with

3

abandoning the Vehicle: "You can do whatever you want with the vehicle, that's up to him and you whatever you want to do with the vehicle itself. We just can't release the lien without some kind of satisfaction on that lien." [*Id*. at 15.]

Mr. Reis and Creditor's representative then discussed the options presented to Debtor. Mr. Reis stated that his "neighbor down the road has a junkyard" and "offered me $100 for it…." [*Id*. at 15.] Mr. Reis and the representative also discussed whether Mr. Reis would buy the Vehicle himself for $100. Creditor's representative stated that Mr. Reis could submit an offer along with "a mechanic's estimate written up on a mechanic's shop's letterhead saying what's wrong with the vehicle and how much it costs to repair that," which Creditor would consider in deciding whether to accept his offer. [*Id*. at 12.] Although Mr. Reis first stated he did not intend "to go through a lot of hassle getting a mechanic to write it up," he later said that he knew a mechanic who could provide a written statement. [*Id*. at 12, 15.] By the end of the call, Mr. Reis suggested that he would send via email or fax a $100 offer to Creditor with pictures of the Vehicle (that would show damage to the vehicle, high odometer mileage, or otherwise provide information to support his offer), and also that if a mechanic's estimate ultimately was needed he could provide that from a local mechanic as well.

However, Mr. Reis did not send in an offer. Instead, on October 19, 2018, Mr. Reis again called Creditor and stated that a local salvage yard owner was willing to remove the car from Mr. Reis's property, pay $100 for it, and waive the tow fee.[3] Creditor's representative stated: "It would probably be best if the guy from the salvage yard would contact us and let us know he's

---

[3] Debtor was present during the call but did not participate.

4

picked it up and make us an offer for $100 to release it." [ECF No. 78-1 at 21.] Mr. Reis then stated: "I just want to get rid of it, but I'll give him your number." [*Id.*]

But, again, this did not occur. Instead, on November 21, 2018, Debtor moved to reopen his bankruptcy case to pursue Creditor for an alleged violation of the discharge injunction, which motion was granted. Then, on December 18, 2018, Debtor filed his Motion for Contempt against Creditor, in which Debtor alleged that Creditor violated "the discharge injunction under Section 524(a)(2) … by collecting and attempting to collect discharged debts by refusing to release its lien on his valueless motor vehicle until [Debtor] paid the full balance due on its [*sic*] prepetition debt." [ECF No. 16 ¶ 11.] Debtor sought to pursue relief for the discharge violation on his own behalf and on behalf of a class of allegedly similarly-situated debtors.

Ten days after Debtor filed the Motion for Contempt, Creditor released its lien on the Vehicle.

## ANALYSIS

**I.     Summary judgment standard.**

Summary judgment is appropriate when the evidence, construed in the light most favorable to the non-movant, confirms that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c), *applicable herein pursuant to* FED. R. BANKR. P. 7056 *and* FED. R. BANKR. P. 9014(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, "the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249.

5

The parties have filed cross-motions for summary judgment with respect to whether Creditor violated the discharge injunction in connection with its dealings with Debtor related to the Vehicle. The summary judgment standard does not change when each side seeks a summary judgment in their favor. *Taft Broadcasting Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991). "The court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.*

## II.     Violations of the discharge injunction and *Taggart v. Lorenzen*.

Section 524 imposes an injunction against the collection of debts discharged in bankruptcy. It states that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [discharged] debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2); *see also In re Jones*, 603 B.R. 325, 332 (Bankr. E.D. Ky. 2019) ("'[t]he purpose of § 524(a) is to ensure that when a bankruptcy court enters an order discharging a debtor's outstanding debts, the debtor will be automatically protected against future attempts to collect on the discharged debts.' *In re Isaacs*, 895 F.3d 904, 910 (6th Cir. 2018)."). A creditor that violates the discharge injunction may be found in contempt of court. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421-23 (6th Cir. 2000). A debtor moving for contempt bears the burden to prove a discharge injunction violation by clear and convincing evidence. *In re Joseph*, 584 B.R. 696, 702 (Bankr. E.D. Ky. 2018) (citation omitted). If the movant establishes that contemptuous conduct occurred, a bankruptcy court may sanction the bad actor. *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 477 (6th Cir. 1996)

6

The U.S. Supreme Court recently determined the standard to apply to a motion contending that a sanctionable discharge injunction violation occurred, and held that a creditor may be found in contempt "when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." *Taggart v. Lorenzen*, 139 S.Ct. 1795, 1801 (2019). The Court specifically rejected a strict liability standard or a subjective standard for discharge injunction violations. Rather, civil contempt may be appropriate pursuant to § 524(a)(2) and § 105(a) "where the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." *Id*. at 1802. Stated differently, the question is whether there is no "fair ground of doubt" regarding whether the discharge order barred the creditor's conduct. *Id*. at 1804. This is because civil contempt is a "severe remedy," and parties that are enjoined must "receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id*. at 1802.

**III.  Creditor did not violate the discharge injunction because its conduct was not objectively coercive.**

Debtor contends that Creditor should be found liable for violating the discharge injunction, citing extensively to an out-of-circuit decision that also concerned a creditor's refusal to release a lien on a vehicle after the debtors obtained a chapter 7 discharge. *Pratt v. GMAC (In re Pratt)*, 462 F.3d 14 (1st Cir. 2006). In *Pratt*, the debtors filed an adversary proceeding against an automobile lender (GMAC) seeking a contempt finding because GMAC refused to either repossess a vehicle surrendered in the debtors' chapter 7 case or to release its lien post-discharge unless the debtors paid their full loan balance. Under Maine law, the debtors could not dispose of the vehicle absent a lien release, and they argued that GMAC prevented them through its conduct from "surrendering" their vehicle as § 521(a)(2)(A) permits. Thus, the debtors

7

contended that GMAC's conduct violated § 524(a)(2).  The bankruptcy court granted a judgment to GMAC based on Maine law (which preserved a lender's right to refuse to release its lien absent full payment of the debt) and the district court affirmed.  But the First Circuit reversed, holding that, while GMAC did not have to repossess the vehicle, and had a right under Maine law to require full payment before releasing its lien, GMAC's actions were objectively coercive, amounted to a demand for reaffirmation of the discharged debt, and violated § 524(a)(2).  The First Circuit explained:

> The particular record facts material to our assessment of objective coercion are: (i) the Pratts timely filed a § 521(a)(2) notice of their intention to surrender the vehicle; (ii) they did nothing to prevent GMAC from repossessing the vehicle; (iii) the value of the inoperable vehicle had plummeted to such an extent that it needed to be towed to a junkyard, which declined to accept it absent a valid lien release; (iv) GMAC determined - presumably based upon the precipitous drop in the vehicle's worth - that it was not cost effective to repossess and resell the vehicle; and (v) according to state law, the vehicle could not be junked unless GMAC released its lien.

*Id*. at 19.  The court explained that, "[i]n assessing violations of the automatic stay and the discharge injunction, the core issue is whether the creditor acted in such a way as to 'coerce' or 'harass' the debtor improperly."  *Id*. (citation omitted).  As a result, "even legitimate state-law rights exercised in a coercive manner might impinge upon the important federal interest served by the discharge injunction, which is to ensure that debtors receive a 'fresh start' and are not unfairly coerced into repaying discharged prepetition debts."  *Id*.

The First Circuit concluded that GMAC's refusal to release its lien was objectively coercive and "had the *practical effect* of eliminating the Pratts' 'surrender' option under § 521(a)(2)."  *Id*. at 20 (emphasis in original).  Importantly, however, the court clarified that it did not "suggest that a secured creditor invariably would be in violation of the discharge

8

injunction were it to insist upon its *in rem* rights under state law" and "the 'coerciveness' involved in each case must be assessed on its particular facts." *Id.*

Debtor contends that *Pratt* controls the outcome in his case.[4] He states that he (i) timely filed a notice of intention to surrender the Vehicle, (ii) did not prevent Creditor from repossessing the Vehicle, (iii) the Vehicle had minimal value and needed to be towed to a salvage yard, which could not accept it absent a lien release, (iv) Creditor decided that it was not economically feasible to repossess and re-sell the vehicle, and (v) Kentucky law (KY. REV. STAT. § 186A.215) requires that a vehicle title cannot transfer absent a lien release. Debtor also argues that, because Creditor determined that the Vehicle is essentially worthless (i.e., its decision not to repossess), the purpose for its lien no longer existed—yet Creditor refused to release its lien until after Debtor filed the Motion for Contempt. Based on these facts, Debtor argues that Creditor's demand for payment prior to releasing the lien, in the face of Debtor's requests to release the lien, amounted to objective coercion that frustrated Debtor's right to surrender the Vehicle in bankruptcy.

In response, and to support its own motion for summary judgment, Creditor argues that a key fact in *Pratt* that led to the First Circuit's decision was that GMAC demanded full payment of the discharged debt before it would release its lien, which Creditor did not demand here. Creditor also heavily relies on a subsequent First Circuit decision that clarifies the holding in *Pratt*. *In re Canning*, 706 F.3d 64 (1st Cir. 2013). Creditor further argues that the "fair grounds for doubt" standard for discharge injunction violation and civil contempt cases in *Taggart v. Lorenzen* precludes a determination in Debtor's favor in this contested matter.

---

[4] Neither the Sixth Circuit nor any court within the Circuit has adopted the holding in *Pratt* with respect to the issue presented herein.

Creditor correctly cites *Canning*, which contains crucial commentary concerning the First Circuit's opinion in *Pratt*. In *Canning*, the debtors filed a chapter 7 petition and gave notice of their intent to surrender their residence. The mortgage lender refused to foreclose or take title to the residence after the debtors received their discharge and reminded the debtors that they still were responsible for taxes and insurance on the residence even if their underlying indebtedness had been discharged. The debtors then commenced an adversary proceeding and asserted that the lender violated the discharge injunction. The First Circuit, affirming the bankruptcy court and its Bankruptcy Appellate Panel, held that there was no violation on the facts presented.

Distinguishing *Pratt*, the First Circuit explained that the lender did not condition the release of the mortgage on the full payment of the discharged indebtedness, and instead proposed to negotiate a resolution with the debtors via a short sale of the residence or a settlement offer. Therefore, the court concluded,

> the record here does not paint a picture in which a secured creditor cornered the debtors between a rock and hard place. The record before us contains no evidence showing that the alternatives [the lender] proposed were unfeasible--that is, the Cannings never explained to the court exactly why a short sale or a settlement was out of the question for them. The record is also devoid of any other indicia of coercion, such as, for example, [the lender]'s refusal to negotiate with the Cannings a compromise different to the one originally proposed. In fact, from the record available to us, it seems that the Cannings employed a "take it or leave it" approach in negotiating with their mortgage lender, who, given its state-law rights over the collateral, did not have to accept the two choices presented. Bankruptcy law, we must emphasize, cannot alter a secured creditor's state-law rights, unless it is shown that those rights are relied upon to coerce payment of a discharged debt. The record before us simply lacks that evidence.

*Canning*, 706 F.3d at 71-72. The First Circuit rejected the Cannings' reading of *Pratt* that "we would have to find a discharge injunction violation every time a secured creditor opposes a debtor's 'foreclose or release' demand based on the business determination that repossession is not cost effective," because "*Pratt* sought to strike a balance between the competing state-law

rights of secured creditors and the bankruptcy rights of debtors, and the reading the Cannings advance improperly skews that balance against secured creditors." *Id*. at 72. The court concluded by quoting the bankruptcy court for the proposition that a "fresh start" in bankruptcy does not "discharge the ongoing burdens of owning property." *Id*. at 73 (citation omitted).

While Debtor's case involves a nearly valueless vehicle, like *Pratt*, and not real property, as in *Canning*, the First Circuit's guidance in *Canning* is apropos here. As in *Canning*, Creditor did not demand full payment of its discharged debt in exchange for a lien release; rather, Creditor presented options to Debtor. Debtor failed to act on any of those options and offers no evidence that those options were unreasonable.

Debtor scheduled the Vehicle as having a value of $150 and thus recognized that the Vehicle was not entirely worthless. While Debtor's Motion for Contempt expressly alleges that Creditor demanded full payment of its discharged ($8,000) debt in exchange for the release of its lien on the Vehicle [ECF No. 16 ¶ 11], the transcripts establish that Creditor did not even demand $150 from Debtor in exchange for a lien release; in fact, *Creditor did not ask Debtor to pay any funds to Creditor at all, let alone pay any specific amount*. Instead, when Debtor called Creditor post-discharge, Creditor's representative stated that a third-party salvage yard could pay "minimal consideration" in exchange for the lien release. Then, when Debtor and Mr. Reis called Creditor together a few weeks later, Creditor's representative discussed different options to accomplish a lien release with Mr. Reis, and ultimately suggested that Mr. Reis put a $100 verbal offer in writing and send it to Creditor, along with pictures or a mechanic's estimate that would support the offer. The representative also stated that the salvage yard owner (which Mr. Reis said was "down the road") could call and negotiate directly with Creditor to obtain a lien release. Finally, in the last call, Mr. Reis and Creditor's representative discussed having the

local salvage yard owner call Creditor to discuss a $100 lien release offer. The call transcripts reflect that Creditor did not engage in objectively coercive behavior to compel Debtor to pay its discharged $8,000 debt. Valid prepetition liens pass through bankruptcy intact, *Johnson v. Home State Bank*, 501 U.S. 78, 82 (1991), and Creditor merely outlined a procedure by which it could obtain compensation solely in exchange for releasing its *in rem* right in the Vehicle. No evidence supports Debtor's position that the options Creditor presented to accomplish a lien release were a subterfuge to coerce payment of the discharged debt.

The Court must digress for two simple observations. First, the Debtor had another option available to secure the lien release. He could have filed a request to redeem pursuant to § 722 and offered a nominal amount to bring Creditor's "demands" to a conclusion. *See*, *e.g.*, *Baer v. HSBC Auto (In re Baer)*, Case No. 10-21096, Adv. Pro. No. 10-2062, 2011 Bankr. LEXIS 1790, at *5-7 (Bankr. E.D. Ky. May 12, 2011). Second, Debtor's argument about the distinction between *Pratt* and *Canning*—that *Pratt* stands as the law for "old vehicles" (repossess or release) and *Canning* applies to real estate—is unavailing. The difference in the two cases is in the facts, not that different law applies to surrender and *in rem* remedies depending on the type of collateral involved.

Thus, the Court generally agrees with the First Circuit's statements in both *Pratt* and *Canning* that whether coercive behavior occurred is dependent on the facts of each case. In this case, Creditor's conduct was not objectively coercive. When speaking with Debtor, Creditor's representatives explained that his debt to Creditor had been discharged but that Creditor still had state law *in rem* lien rights in the Vehicle that survived the bankruptcy process. Creditor offered options to accomplish a release of that lien, and requested objective information (such as a mechanic's estimate, pictures, or a call from a salvage yard) that would permit it to evaluate a

relatively low-dollar offer for its lien release based on the post-discharge value of the Vehicle. Simply put, even if it did not make economic sense for Creditor to repossess the Vehicle, this does not mean that its lien on the Vehicle had no value.

Because Creditor's conduct in its dealings with Debtor was not objectively coercive, no discharge injunction violation occurred. As a result, the Court need not apply the standard in *Taggart v. Lorenzen* and consider whether an objectively reasonable basis exists to conclude that Creditor's conduct was lawful. *Taggart*, 139 S.Ct. at 1801.

Finally, Debtor sought to certify this contested matter as a class action. *See*, *e.g.*, *In re Biery*, Case No. 10-23338, 2014 Bankr. LEXIS 1603 (Bankr. E.D. Ky. April 14, 2014) (holding that Rule 7023 may be applied to motions for contempt for violations of § 524(a)(2)). Because no discharge injunction violation occurred related to Creditor's dealings with Debtor, *i.e.*, the proposed class representative's individual claim lacks merit, the request to certify this contested matter as a class action is moot. *See*, *e.g.*, *George v. Harris Cty.*, Civil Action No. H-10-3235, 2012 U.S. Dist. LEXIS 94318, at *54-55 (S.D. Tex. July 9, 2012). While someday a proposed class action plaintiff/debtor may present a viable basis to certify a class to pursue a widespread violation of the discharge injunction because a creditor engages in objectively coercive conduct in refusing to repossess or release a lien, Debtor's case does not provide such a basis.

## CONCLUSION

There is no dispute of material fact and Creditor is entitled to a judgment as a matter of law. As a result, it is ORDERED that Creditor's Motion for Summary Judgment [ECF No. 78] is GRANTED, Debtor's Motion for Summary Judgment [ECF No. 75] is DENIED, and Debtor's Motion for Contempt [ECF No. 16] is DENIED.

14

_____
**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Wednesday, October 2, 2019**
**(tnw)**